In the Matter of the Estate of HATTIE HICKMOTT, Deceased.

Surrogate's Court, Ontario County, March 8, 1938.

*Samuel R. Levy,* for James W. Hornsby, petitioner.

*Willis C. Ellis,* for Rose Gilman and Alice May Gilman, respondents.

CRIBB, S. This is a proceeding brought by the petitioner, James W. Hornsby, whereby he seeks an adjudication declaring him to be the owner of a certain bank account and entitled to possession of the pass book issued thereon and now in the possession of the executrix, deposited in the Canandaigua National Bank and Trust Company in his name and that of the decedent, Hatty Hickmott, " as joint tenants, payable to either or the survivor." The executrix and Rose Gilman, sole beneficiary under decedent's will, filed an answer.

The decedent, Hattie Hickmott, died testate on the 7th day of December, 1936, survived by two brothers, Ward Hickmott and George Hickmott, and two sisters, Rose Gilman and Emma Chrys-

ler, and by Howard Hickmott, a nephew, son of a deceased brother. The decedent left a last will and testament dated May 22, 1935, which was admitted to probate by this court on the 23d day of February, 1937, by which, after the payment of her just debts and funeral expenses, she gave all of her property to her said sister, Rose Gilman, and named her niece, Alice May Gilman, a daughter of said Rose Gilman, executrix. The property consisted of approximately $177 in cash and a few pieces of furniture. In addition to such assets there was an account of $1,000 in the Canandaigua National Bank and Trust Company standing in the name of the deceased and James W. Hornsby " as joint tenants, payable to either or the survivor." Such account is the subject of this litigation.

The decedent never married and was eighty-two years of age when she died. Some time in 1913 she entered the employ of James W. Hornsby, the petitioner herein, as housekeeper, and remained in his service continuously, except for a period of six weeks, until the 17th day of June, 1936, when she gave up work on account of her health and went to the home of her said sister, Rose Gilman, where she remained until her death on the 7th day of December, 1936. During such period of employment she received one dollar per week with room and board.

It appears that for many years she frequently visited a physician; that in her later years she suffered from a rupture and was also subject to the general physical weakening which usually accompanies one of advanced years. An examination of diaries or journals which she kept during the last eighteen years of her life indicates that she lived simply and was frugal and thrifty.

On the 28th day of May, 1917, Miss Hickmott opened an interest account in her individual name in the Canandaigua National Bank (which became the Canandaigua National Bank and Trust Company in 1918) in the amount of $100. A pass book numbered 10625 was issued to her. Subsequent deposits, exclusive of interest credited from time to time, were made as follows: $200, November 22, 1918; $100, August 12, 1919; $100, September 2, 1919; $500, July 1, 1924; $100, January 3, 1925, and $100, October 30, 1931. Interest was credited on the account by the bank at regular intervals, all of which was withdrawn during the lifetime of Miss Hickmott either annually or semi-annually. Only two withdrawals of principal were made, one of $100 on April 24, 1918, and one of $100 on August 29, 1934, which was for the purpose of a monument. So that at the time of decedent's death, December 7, 1936, said bank account amounted to $1,000 and accrued interest of approximately $10.

On the 21st day of May, 1923, she signed and left with or sent to the bank a written instrument reading as follows:

" CANANDAIGUA, N. Y., *May 21, 1923.*

" The Canandaigua National Bank and Trust Company is hereby requested to enter the name of James W. Hornsby as joint tenant with myself in account No. 10625 or any continuation of it, with all rights now possessed by me, any balance therein being payable to either of us or the survivor.

" Signature    Miss HATTIE HICKMOTT."

This notice was made on a form apparently furnished by the bank, all of it being printed excepting the date, Hornsby's name and the account number, which were written in ink by some person other than Miss Hickmott. The signature was in her handwriting. The bank then added the name " James W. Hornsby " on the original pass book followed by the stamped words " as joint tenants, payable to either or the survivor." The pass book appears never to have been in the possession of Hornsby.

Questions of ownership of " joint " bank accounts have been troublesome to the courts for many years. A long line of decisions, many of them difficult to reconcile, has produced considerable confusion in thought. For the purposes in this case we are asked to consider three sections of the Banking Law, i. e., section 249, relating to savings banks, section 198, relating to trust companies, and section 148, relating to other banks, as they were prior to June 30, 1937, when section 198 was repealed and section 148 was consolidated with provisions from others and renumbered section 134 of the present Banking Law. The provisions of these sections are practically the same, with the exception that there was added to section 249 (relating to savings banks) in 1914 the provision: " The making of the deposit in such form shall, in the absence of fraud or undue influence, be conclusive evidence, in any action or proceeding to which either such savings bank or the surviving depositor is a party, of the intention of both depositors to vest title to such deposit and the additions thereto in such survivor."

There is no allegation of fraud or undue influence in this case. But respondents have raised the question as to whether sections 148, 198 and 249 of the Banking Law apply to joint deposits in national banks. My attention is called to no cases in which they have been applied to such deposits. In *Herrick* v. *Hamilton* (160 Misc. 440) the deposit in question was made in a national bank. The court, after referring to the opinion in *Matter of Garlock* (157 Misc. 571), wherein the court held that section 249 applies to savings and loan associations as well as savings banks, said: " National

banks are in part like institutions. They maintain interest or savings departments where, as here, deposits and withdrawals are made and entered in a book which must be presented upon a withdrawal. We *incline* [italics mine] to the view that the rights of joint depositors in a national bank and the survivor of them are the same as in a deposit in a State bank, trust company or savings bank. Literally, section 148 applies to any ' bank.' Nevertheless, the word ' bank ' is defined as being a domestic institution. (Banking Law, § 2.) '' Despite the inclination above expressed the court then proceeded to decide the case under the common-law rule. I am of the opinion that this controversy should be determined under the same rule, in which case the crucial question is whether Miss Hickmott intended to establish her bank account in such form that Hornsby could look after it as a convenience to her, or whether she intended it to be a joint account with right of survivorship to Hornsby. '' The intent of the parties, if disclosed, controls.'' (*Brumer* v. *Brumer*, 223 App. Div. 186.)

There was no kinship between Miss Hickmott and James Hornsby. From 1913 to June 17, 1936, when she terminated her services because of ill health, the only relationship between them was that of employer and employee.

She received only one dollar per week with board and room as compensation. It appears that Hornsby at least on one occasion deducted a portion of her wages because of illness, as an entry in her diary reads: '' James W. Hornsby paid me one dollar a week since the 15th of March, 1924, only when I was sick with cold did not pay.'' It further appears from entries in her diary or journal that Hornsby from time to time borrowed money from her. These entries indicate in some instances the loaning of money by her and in others the repayment of such moneys by Hornsby to her, and in other instances refer to '' interest money '' paid to her by Hornsby. With one exception there is no proof of any feeling toward Hornsby on the part of Miss Hickmott of such a character as would inspire her to give him her property or any portion of it. One witness did testify that in September, 1936, the decedent came to visit Mrs. Chrysler, a sister of the decedent, at Geneva, by whom witness was at the time employed. She stated that on this occasion she accompanied the decedent to a store where the latter purchased a four-dollar hat, and that decedent said to her: '' Do you know this hat was a present from Jim? '' She also stated that the decedent said that Jim had always been good and bought her everything. Witness was asked if Miss Hickmott said anything about her money. She replied: '' Yes, she asked me if I thought that Jim would give her a good burial with her life's money that is in a bank book or

words to that effect." She was further asked if she had any con-
versation with decedent relative to her blood relations, and replied:
" She was very much dissatisfied where she was and intended to
go back and live with Jim [Hornsby] as soon as she could make
arrangements;" that " Mrs. Gilman had not spoken to her for two
months and she was not going to stay there." Miss Hickmott was
then living with her sister, Mrs. Gilman, and had been living with
her ever since giving up her work in the previous June. There is
no other evidence in the case that Miss Hickmott had other than
the best of feeling for her sister, Mrs. Gilman, or that she enter-
tained any feeling toward Hornsby other than that which might be
natural for an employee who had remained in the service of an
employer for twenty-three years. Offsetting this alleged statement
of Hickmott are the facts that, upon leaving Hornsby's service,
she voluntarily went to live with her sister, Rose Gilman (although
she had two brothers and one other sister), and that only sixteen
months before this alleged conversation she executed a will making
Rose Gilman sole beneficiary thereunder, to which I shall refer
later.

For some time prior to the 21st day of May, 1923, when Miss
Hickmott caused the name of Hornsby to be added to her bank book,
she had on several occasions sent him to the bank with a note
directing the bank to pay over to him the current interest as credited
on her bank account. After adding Hornsby's name to the bank
book in 1923 no withdrawals were made until January 4, 1924,
when the total interest for 1923 was withdrawn on a check signed
by herself. No further withdrawals were made in 1924, but on
January 3, 1925, she again sent a note to the bank directing it to
pay to Hornsby the interest " due on my deposit." Thereafter
and until July 17, 1933, inclusive, all withdrawals from said bank
account were made on checks signed by Hattie Hickmott with the
exception of two which were signed by James Hornsby. Some of
these checks were payable to cash and some to James W. Hornsby.
Three withdrawals were made in 1934, all on receipts left at the
bank, the first of which was signed by Hattie Hickmott, the other
two by James Hornsby. One of these latter was for the sum of
$100, which, it is stipulated, was used by the decedent in the pur-
chase of a monument. Only four more withdrawals were made
from the account, all of which were on checks signed by James
Hornsby and payable to " cash." From these records it appears
that Miss Hickmott signed her own checks and receipts whenever
she was able to do so, and that only after July, 1934, when she was
growing more feeble, did she leave this part of her business affairs to
Hornsby exclusively, he having drawn the last check on said account

on the 2d day of July, 1936 — a few days after she left his service. Miss Hickmott was then living with Rose Gilman, her sister. Regarding that transaction, John Gilman, husband of Rose Gilman, testified that Miss Hickmott asked him if he would drive Hornsby (he had no car) to Canandaigua so that he could see Doctor Brockmyre for her and get her interest for her. Continuing his testimony, he said: "She [Miss Hickmott] asked me and I told her yes. I got the car and Mr. Hornsby came down to my place on foot and from my house I brought him to Canandaigua and he first went to Doctor Brockmyre and then he went to the bank and went to my home and when he got there he gave her the money. He [Hornsby] said, 'Here is your interest and here is your book.'" He further stated that Miss Hickmott said, "alright," and that she retained the pass book.

After Hornsby's name was added to the account all of the checks or orders of withdrawals *signed by Miss Hickmott* were payable to Hornsby excepting one in each of the years 1928, 1929 and 1931, which, with occasional entries in her diary to the effect that Jim got her interest at the bank, indicates that it was her custom to send him to the bank for the interest. As late as January 12, 1935, a diary entry reads: "Jim went and got 6 months interest from Canandaigua N Bank & Trust Co. Can *for me* " (italics mine), and under date of January 4, 1936, is this entry: "James went for me Jan. 4, 1936, Interest money $11.25 Canandga Nat Bank & Trust Co. 6 months." The last interest money paid by the bank before decedent's death was on July 2, 1936, and in decedent's diary we find: "July 2, 1936. Interest money $10 Canandga Nat Bank & Trust Co. 6 months."

Gilman also testified that on an occasion two or three years before Miss Hickmott died, when he was working for Hornsby, the latter talked about Miss Hickmott's money. Asked to relate the conversation, he said: "We got to talking about my sister-in-law's money and he said he was a signer on the book so that he could go and draw her interest so that she wouldn't have to go. She was getting along and she was feeble and old, unless she had somebody to take her she couldn't go." On cross-examination Gilman was asked: "Q. Do you remember what else he told you about? A. He told me he could draw every cent out of that bank book, his name is on the book. Q. What else? A. He said it was her money. I don't want any of her money. Q. What did you say? A. Nothing. Q. And did he say that he was a signer on the book so that he could draw the interest? A. Yes, sir." It is to be noted that this conversation was in 1933 or 1934, and no deposits, other than interest credits, were made to the account after October 30, 1931.

There is still further proof of no intent on the part of Miss Hickmott to change her account so that Hornsby would have legal title thereto in the event he survived her. On the day following her death Hornsby came to Rose Gilman's home and a conversation relative to the bank account took place in the presence of Rose Gilman and John Gilman, her husband. Asked at the trial to repeat the conversation, Mrs. Gilman answered: " He [Hornsby] asked me to get ready and go with him to Canandaigua to the bank and he would sign off on that bank account. He said he was not feeling well himself and he wanted to get it signed as soon as possible and I replied that I couldn't go then. Of course there was the funeral to come and I said I couldn't leave now because that kept me there and I was too tired, that I had been up for about a week night and day with her and I had to have some rest; that I could not go then that I would go with him next week." The testimony of John Gilman concerning this conversation was substantially the same. Mrs. Gilman also testified that about the time Miss Hickmott made her will Hornsby spoke of the bank account. She was asked: " Q. Now give the conversation about the time the Will was made? A. Oh, he said he was a signer on the book and would make no claim to it and he would sign off and it was her money and it was only for convenience that his name was put on the book. Q. And that was about the time the Will was drawn? A. Yes." She also testified that he made similar statements on other occasions.

The proof further shows that in April, 1937, Hornsby had a conversation relative to this bank account with one Howard Converse, a neighbor, in the presence of the latter's daughter-in-law, Mabel Converse (both wholly disinterested parties). Howard Converse was asked: " Q. Just state in your own words what he [Hornsby] said. A. He said that she had an account in the bank here and she put it in both of their names so that he could look after it for her. I asked him whose money it was in the beginning and he said her money, it being in both of their names he didn't see why he couldn't draw it, and I told him I didn't see why he couldn't either. * * * Q. Can you repeat again what was said by Mr. Hornsby relative to the account being in both hands? A. He said that they put it in there so that she was not very well and he came up to look after it for her." Converse further testified that Hornsby said his name was put on the account as a matter of convenience so he could draw it for her. Mabel Converse testified: " Q. Now tell what you remember of that conversation? A. I really don't feel that my memory serves me enough to make any decided statement, but I do remember him saying that this lady with whom they had lived had a bank account and his name had been placed on the book

as a matter of convenience in order that he could do business for her and save her trips to town." She also swore Hornsby stated that the money belonged to Miss Hickmott.

Willis C. Ellis, attorney for respondents, testified that some time in January, 1937, Hornsby came to his office regarding the Hickmott estate. In view of Mr. Ellis' standing at the bar his testimony is particularly effective. " Q. Will you state what that conversation was? A. As near as I can remember Mr. Hornsby came in the office and asked me when the Will was going to be probated, and if the Gilmans had filed a petition for the probate, and I told him that it had not as yet inasmuch as they had not been over. If I remember Mr. Hornsby said that he promised to see that the funeral expenses were paid and I told him not to pay any funeral expenses, let them be paid as they should out of the estate. I asked him how much there was in the estate and he said there was a bank account in the Canandaigua National Bank and Trust Company of One Thousand Dollars, and I asked him if it was Miss Hickmott's and he said that it was, and then he told me that it was a joint account in both names. Q. That is in Miss Hickmott's name and his name? A. Yes, his name, and I asked him if he made any claim to the monies and he said he did not. He said it was turned over as a matter of convenience so that he could draw the interest for Miss Hickmott. He said that it was not convenient for her to come up to Canandaigua and draw the interest and it was changed over so that he could draw it for her. Q. In that conversation was there anything said as regards the health of Miss Hickmott? A. Why yes, there was. I don't remember the exact words, he said that her condition sometimes was such that it was impossible for her to go to Canandaigua." The record shows that subsequently Attorney Ellis wrote Hornsby a letter asking Hornsby, in view of their conversation, to call at his office and arrange for a transfer of the account to decedent's executrix. Hornsby did not comply, and Ellis notified the bank not to pay the moneys to Hornsby.

Hornsby admits being present on the occasions related by the Gilmans and the Converses, but denies making the statements attributed to him by them. He was not asked concerning, nor did he deny, the testimony of Attorney Ellis.

Furthermore, the record shows that Hattie Hickmott executed her will on the 22d day of May, 1935, whereby she first directed " the payment of my just debts and funeral expenses as soon after my decease as may be convenient," and secondly made her sister, Rose Gilman, the sole beneficiary thereunder, and finally named Alice May Gilman, her niece, sole executrix thereof. At the time

of her death the assets of decedent, exclusive of the bank account, consisted of $177 in cash and a few personal and household effects, evidently of little value. It appears that her funeral expenses were $400 and creditors' claims amount to about $25. It is fair to assume that, for one in her position, her financial status had not greatly changed during the eighteen months intervening between the making of the will and her death. The will was made many years after the bank account was changed. Decedent could have had no conceivable purpose in making the will other than to remember her sister, Rose, to the exclusion of her other relatives. If she understood that the bank account was or would become the property of Hornsby and that he would pay her funeral expenses, why did she, frugal as she was, retain a lawyer to draw her will *directing the payment of her funeral expenses and debts* and bequeathing the residue to her sister, when she must have known that her sister would in fact receive nothing because of the paucity of her estate?

There is some proof that Hornsby said that Miss Hickmott had wanted him to see that her funeral expenses were paid. This is not inconsistent with our reasoning. Many people of advanced years are prone to talk a great deal about their burial expenses. Miss Hickmott had lived many years in Hornsby's home. It was not unnatural that she should ask him to see that she had a good burial and that the expenses were paid. In any event, her written instructions directed such payment from her estate.

Counsel for claimant Hornsby has taken the position that Miss Hickmott could not have saved $1,000. I cannot agree with this contention. She was fifty-nine years old when she went to work for Hornsby. Prior to this she had been employed in various places, and, with her thrift, may easily have accumulated a few dollars. She had received $930 for an interest in lands. She had $130 in the Canandaigua National Bank in 1908. Her diaries show she had $100 at interest in the Shortsville bank in 1926, and also contain many entries of interest received from Gilman, Hornsby and Geneva Trust Company. She also had interest from the Canandaigua National Bank and Trust Company. Proof is ample that she could have accumulated all of the moneys involved in this litigation.

There is no competent proof other than the facts recited tending to establish a transfer to Hornsby of a legal title to the fund in question. No consideration for a transfer was proven; no relationship or indebtedness between the parties was shown; no evidence of an intent to give, or of a delivery of the subject of the gift, was presented. There is no proof that Hornsby ever contributed any

amount to the deposit. On the other hand, statements made by Hornsby, both before and after the death of the decedent, show conclusively that the parties themselves did not understand that any transfer of title had been accomplished.

It is true that the form of the deposit in the instant case imparts a joint tenancy with right of survivorship. But this alone is not sufficient to establish the intent of the person making it to create a trust in behalf of another or to give to such another joint interest in or ownership of the deposit. (*Kelley* v. *Beers*, 194 N. Y. 49.) In *Beaver* v. *Beaver* (117 N. Y. 421) it was said: " We are inclined to think that to infer a gift from the form of the deposit alone would, in the great majority of cases, and especially where the deposit was of any considerable amount, impute an intention which never existed and defeat the real purpose of the depositor." In *Clary* v. *Fitzgerald* (155 App. Div. 659) it was held that a deposit in a savings bank to the credit of " Mrs. Kate Connelly or Mrs. Kate A. Fitzgerald, either or survivor, may draw," presumptively created a joint tenancy, but this decision was placed upon the provisions of section 144 of the Banking Law (now Banking Law, § 249), which creates a presumption of joint tenancy in the case of a deposit of money to the credit of the depositor and another person and " in form to be paid to either or the survivor of them." It was stated in that case that had it not been for the provisions of the statute no presumption of joint tenancy would have arisen, and that the statutory presumption itself would disappear if proof of a contrary tenor was forthcoming.

It would, therefore, appear that if a deposit, as in this case, in a national bank is not subject to the sections of the Banking Law above referred to, the form of the deposit is not alone controlling, and we are permitted to learn the true intent of the depositor from any competent evidence available.

While I have declined to consider this case as falling under the provisions of sections 249, 198 and 148 of the Banking Law (as they existed prior to June 30, 1937), let us assume that the rights of joint depositors in a national bank, and the survivor of them, are the same as in a deposit in a savings bank, and that in the instant case the account having been in form to be paid to either or the survivor of them, an irrebuttable presumption resulted, upon the death of Miss Hickmott, whereby the funds in question became vested in Hornsby as survivor. What shall be the effect where the survivor, the only person to whose benefit such irrebuttable presumption inures, makes statements (to the same effect as made by him prior to decedent's death) that the moneys are not his, and never were, but belonged to decedent and he claims no interest in them,

and that the joint account was made only as a convenience to decedent? It seems to me that he has then opened the door and that competent evidence may be received to establish the true and intended ownership of the fund, and that he is estopped from later claiming benefit under the presumptive provisions of the law in order to secure title. I cannot conceive that it was the intention of the Legislature to create a statute, behind which, under such circumstances, a party might hide for the purpose of vesting himself with moneys which neither he nor the original owner intended him to take.

I have observed all the witnesses on the stand in this case and I am satisfied that Hornsby made the statements attributed to him by the several witnesses as hereinbefore discussed; that such statements by Hornsby were true; and that he never intended that the avails of the bank account were his property or would become his property if he survived Miss Hickmott, or that he would claim title thereto, until some considerable time after her death, when from some unrevealed source he gained the notion that he might successfully claim and secure the same. I am equally satisfied that Hattie Hickmott never intended that the moneys in question should become the property of Hornsby.

This proceeding is brought under section 206-a of the Surrogate's Court Act. This section vests broad powers in the Surrogate's Court to make any decree which justice requires in respect to a controversy thereunder. In *Matter of Glen* (157 Misc. 753) the decedent had converted a savings bank account into a joint account "payable to either or survivor," in form to fall within section 249 of the Banking Law. But, prior to creating this joint account, decedent had entered into a contract with his wife who survived him. The contract was of testamentary character and was admitted to probate as his will. In that case the surviving depositor sought under section 206-a to obtain from decedent's representative the pass book and the funds evidenced thereby. The surrogate found for the respondents. Under the equitable powers afforded this court by section 206-a, it seems to me that in this case, as in *Matter of Glen* (*supra*), the irrebuttable presumption under section 249 of the Banking Law, even if it does apply to deposits in national banks, may be disregarded and a decision rendered in accordance with justice.

Therefore, the prayer of the petitioner is denied, and I hold the bank book, and account thereby evidenced, to be the property of the estate of Hattie Hickmott, deceased.

Decree may be submitted on notice, accordingly.